**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**


**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                          **Criminal Case No. 2:22-CR-1
                                           (JUDGE KLEEH)**

**ANTHONY DWAYNE MACK,**
        **Defendant.**


**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS, [ECF NO. 21], BE DENIED**

Pending before the undersigned Magistrate Judge is Defendant Anthony Dwayne Mack's Motion to Suppress Physical Evidence, [ECF No. 21]. By Order dated April 19, 2022, [ECF No. 23], United States District Judge Thomas S. Kleeh referred the motion to the undersigned to enter a report and recommendation as to disposition of the motion.

The undersigned is also in receipt of the Government's Objection to Defendant's Motion to Suppress, [ECF No. 22], and Government's Supplemental Objection, [ECF No. 32]. The undersigned conducted a hearing on the suppression motion on May 17, 2022, at which time the Court heard witness testimony, accepted exhibits into evidence, and heard the argument of counsel for both parties.

Based on a detailed review of Defendant's Motion, [ECF No. 21], Government's Objection, [ECF No. 22], Government's Supplemental Objection, [ECF No. 32], the exhibits introduced, the testimony provided, and oral arguments offered, the undersigned **RECOMMENDS** Defendant's Motion to Suppress Physical Evidence, [ECF No. 21], be **DENIED** as set forth herein.

## I. FACTUAL BACKGROUND

On July 26, 2021, Segreant Detective Andrew Myers ("Myers") of the Noble County, Ohio Sheriff's Office conducted an interview with a confidential informant ("CI"). The CI described to Myers that a "black male" was the significant other of a woman named Tana Guiler ("Guiler"), and the CI believed this male was the source of methamphetamine for Guiler, who was trafficking drugs out of her house in Noble County, Ohio.

Thereafter, Myers and other members of law enforcement began surveillance on Guiler's home. During the surveillance, Myers observed a grey Cadillac Escalade in the driveway, and a black male sitting in Guiler's backyard. The vehicle was registered to Anthony Dwayne Mack, who matched the description of the individual observed by Myers. The Noble County, Ohio Sheriff's Office was familiar with Mack because of Mack's criminal history, including, but not limited to, prior charges for Complicity to Drug Trafficking in Noble County, Ohio in 2014 and Possession of Controlled Substances and Trafficking of Controlled Substances charges in nearby Washington County, Ohio in 2017.

Myers sought and obtained a search warrant to place a GPS tracking device on Mack's vehicle. Tracking data for the vehicle revealed that it was making frequent trips from Noble County, Ohio to the Elkins, West Virginia area; the vehicle was also observed making trips to and from Detroit, Michigan. Myers noted that the vehicle's travel was similar in nature to Mack's prior cases where he would reside with a local resident and serve as a trafficking source of illegal drugs which would then be distributed to other local buyers. An extension of the GPS tracking warrant was later sought and obtained.

Meanwhile, in Randolph County, West Virginia, the Mountain Region Drug and Violent Crime Task Force ("MRDTF") were investigating a suspected drug house located on Genesis Lane in Coalton, West Virginia.

Mid-day on September 23, 2021, West Virginia State Police Corporal and MRDTF Agent Joshua Tallman ("Tallman") was drafting a search warrant for the Genesis Lane house after executing a series of controlled buys from the home. Then, MRDTF Commander David Vanmeter received information from the drug task force in Noble County, Ohio that the Cadillac Escalade belonging to Mack was under investigation, had a GPS tracking device on it and was presently in the Coalton, West Virginia area where officers were seeking to execute the Genesis Lane search warrant.

Around the same time, the wife of a West Virginia State Police Sergeant D'Weise, ("D'Weise") who resides near Genesis Lane, observed an unfamiliar Cadillac Escalade in her driveway. She called her husband to report the sighting. D'Weise, while driving to his home, observed the vehicle on a nearby road and observed the vehicle commit a traffic violation. D'Weise conducted a traffic stop and identified the driver of the vehicle as Mack. D'Weise ran the vehicle information and Mack's driver's license number through the communications center during the traffic stop. D'Weise issued a warning for the traffic violation to Mack and let Mack proceed with his travel. Both Smithson and D'Weise contacted Tallman and provided him information regarding Mack's presence in the area that day. Tallman finished drafting his affidavit and sought and obtained the search warrant for the Genesis Lane residence.

A search of the Genesis Lane residence yielded drug use paraphernalia, digital scales, and a powder substance consistent with heroin or fentanyl. During the search warrant execution, Tallman interviewed a woman, Patricia Noel, at the house who, when questioned about the Cadillac Escalade, reported that two black males brought "dope" to the house on the same date, September 23, 2021. Noel did not know their names, but she observed one of the men give methamphetamine to Andre "Dre" Johnson, III. Tallman later interviewed Dre when he arrived on

scene; Dre remarked "you guys need to be careful; these guys are from out of state, with connections to Detroit, and I don't want to see anyone get hurt."

In early October 2021, Patrolman Sayre of the Elkins Police Department was approached, in person, by a community member with information regarding Mack. This individual told Sayre that Mack was transporting drugs from Ohio to Elkins, West Virginia, and provided details regarding how Mack blended in when trafficking drugs. The individual further provided that Mack was using an apartment located at 49 Ash Lane as a stash house to store his drugs; the source knew this because the source had personally observed Mack at 49 Ash Lane.

After communications between the Noble County, Ohio Sheriff's Office and the MRDTF, a meeting was scheduled for October 26, 2021 to share information and coordinate the multi-state investigations of Mack and the Cadillac. Myers, Tallman, and Sayre were all in attendance for the October 26, 2021 meeting and shared the information they had acquired regarding Mack.

In the evening on October 26, 2021, Tallman conducted surveillance and observed Mack's vehicle around the Elkins area. Tallman followed the vehicle to two separate apartment buildings – Gateway Apartments and the Ash Lane apartments – both known for drug activity. At both locations, Tallman observed an individual from the vehicle rapidly exit the vehicle, enter the apartments, then return to the vehicle. Tallman believed these to be drug deals or "drops," but could not identify the individual due to it being dark outside.

On the evening of October 29, 2021, Myers notified local authorities, notably Tallman, that Mack's vehicle was traveling towards the Elkins, West Virginia area. Tallman asked Myers to follow until local authorities could intercept and follow Mack. Tallman then called Lieutenant and K-9 Handler Dustin Cale ("Cale") of the Philippi Police Department and Sayre to inform them

4

Mack was headed towards Elkins and to ask them to be prepared in case a traffic stop was conducted.

Sayre identified the vehicle entering town and proceeded to follow it. Soon thereafter, Sayre witnessed the vehicle commit the traffic violation of crossing left of center. Sayre contacted Tallman to inform him of the observed traffic violation and to ask whether he should stop the vehicle now. Tallman, "based off everything, the totality of all the circumstances," including the vehicle's recent visits to Elkins apartments known for drug trafficking activity and GPS data showing the trips to and from Detroit, Michigan, "had a "good belief . . . that there would be drugs in the vehicle," and Tallman directed that Sayre stop the vehicle.

Sayre initiated a traffic stop on the vehicle. Defendant Mack was the driver of the vehicle with Shelby Holloman riding in the front passenger seat. During the stop, Sayre observed suspicious behavior such as the occupants shuffling around the center console when initially pulled over, the appearance of Mack's stimulated carotid artery, and Mack's pacing back and forth once he stepped outside the vehicle.

Cale arrived on the scene shortly after the traffic stop began, under ten minutes later, with canine Raptor to conduct an open-air sniff. Raptor made a positive indication for the presence of drugs in the vehicle, and authorities began to search the vehicle. Due to heavy rain, authorities were unable to fully search the vehicle; therefore, it was towed so a complete search could be made. Methamphetamine and other paraphernalia were recovered in the search, forming the basis of the underlying charges herein.

## II. PROCEDURAL BACKGROUND

On February 15, 2022, a Grand Jury returned a multi-count indictment which accused Defendant Anthony Mack ("Mack") in Count One of Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections

841(a)(1), 841(b)(1)(C), and 846, and in Count Two of Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(A). [ECF No. 1].

In his Motion to Suppress, filed on April 15, 2022, Defendant Mack first argues that the traffic stop, which lead to the discovery of the at-issue drug evidence, occurred without reasonable suspicion and, thus, is unlawful. [ECF No. 21 at 4]. Defendant Mack specifically argues that the validity of the traffic stop hinges on uncorroborated evidence that Mack was driving left of center, but officers did not allege a violation of a code section nor was a ticket issued for the alleged conduct. Defendant Mack secondly argues that deputies violated his Fourth Amendment rights by extending the traffic stop and seizure in order to await the arrival of a K9 and in order to conduct a drug investigation. [ECF No. 21 at 5-6]. Defendant Mack contends officers "failed to articulate any independent reasonable suspicion that justified a continued detention while waiting for the arrival of the K-9." [ECF No. 21 at 6].

In its Objection Response, the Government argues that the stop of Mack's vehicle was justified as Officer Sayre observed the vehicle travel left of center in violation of West Virginia Code § 17C-7-1(a).[1]  [ECF No. 22 at 2]. The Government further argues that "the approximate 3 minute detention, or less, of Mack prior to the K9 search was constitutionally permissible." [ECF No. 22 at 2].

---

[1] West Virginia Code § 17C-7-1(a) provides that "Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as [provided.]" Any person who violates this provision shall be "guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $100; upon a second conviction within one year thereafter, shall be fined not more than $200; and upon a third or subsequent conviction, shall be fined not more than $500." W. Va. Code § 17C-7-1(c). The undersigned would further note that West Virginia Code § 17C-3-4 further provides that "The driver of any vehicle and the operator of any streetcar shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this chapter."

In its Supplemental Objection, the Government asserts that, in addition to the center-line violation, the reason for the traffic stop was that the Mountain Region Drug Task Force ("MRDTF") had reasonable suspicion, based upon tracker warrants, as well as the observed activities and sightings of Mack's vehicle, that Mack was in possession of methamphetamine in which he intended to distribute. [ECF No. 32 at 1-2].

### III. SUMMARY OF TESTIMONY AND EVIDENCE

During the aforementioned suppression hearing on May 17, 2022, the Court heard sworn testimony from four witnesses:

A.  Shelby Holloman;

B.  Sergeant Detective Andrew Myers of the Noble County, Ohio Sheriff's Office;

C.  West Virginia State Police Corporal and MRDTF Agent Joshua Tallman;

D.  Patrolman Daniel T. Sayre of the Elkins Police Department;

E.  Lieutenant and K9-Handler Dustin Cale of the Philippi Police Department; and

F.  Defendant Anthony Dwayne Mack.

At the suppression hearing, the Court received into evidence the (1) Government's Exhibit No. 1, Philippi Police Department K-9 Deployment Report, [ECF No. 36-1]; (2) Government's Exhibit No. 2, Application and Affidavit for GPS Tracking Device, [ECF No. 32-1 and ECF No. 36-2]; (3) Government's Exhibit No. 3, Search Warrant Order Finding Probable Cause for GPS Tracking Device, and Application, Affidavit, and Order for Extension of GPS Tracking Device, [ECF No. 32-2 and 36-3]; and (4) Government's Exhibit No. 4, Randolph County 9-1-1 Call for Service Detail Report, [ECF No. 36-4]. Lastly, the Court also heard oral argument from the parties.

### A. Testimony of Shelby Holloman[2]

Defendant first called[3] Shelby Holloman to testify. [9:08:58-9:13:25].[4] Holloman testified that on the evening of October 29, 2021, she and Defendant Anthony Mack were driving in his vehicle to Elkins, West Virginia. [9:15:30-9:16:47; 9:21:01-9:21:07]. Holloman was awake, alert, and sitting in the front passenger seat of the vehicle; Holloman had her cellular phone sitting flat on the dashboard of the vehicle. Holloman was leaning forward as she was trying to make a shoe purchase on her phone through ShoeDazzle, and cellular service was bad in the area. She was listening for a sound notification, or "ding" to confirm her shoe purchase. [9:16:48-9:17:29; 9:17:40-9:17:49; 9:21:08-9:22:27]. She was able to observe the road ahead of the vehicle and the path the vehicle was taking. [9:17:30-9:17:39]. Holloman does not recall seeing the driver, Defendant Mack, drive erratically or commit any traffic violations. She felt Defendant Mack was a coherent, good driver. [9:18:01-9:19:05]. Holloman never observed Mack cross over into another lane of travel, cross the center line, or drive on the center line. She testified she would have been concerned if she had observed any such swerving. [9:19:05-9:20:37; 9:22:28-9:24:16].

At some point, a traffic stop of the vehicle occurred. [9:17:50-9:18:00]. Before the stop, it was not raining, but by the end of the traffic stop, it had begun to rain. [9:20:38-9:21:00].

---

[2] Shelby Holloman was found to be indigent and was appointed counsel Harry A. Smith, III to represent her during these proceedings. *See* Case No. 2:22-MC-3. Smith stated on the record that he previously met with Holloman and informed her of her constitutional rights and the possible implications of testifying. Holloman, having considered her constitutional rights, still desired to testify at this hearing. Holloman was also advised of her constitutional rights, including her Fifth Amendment right against self-incrimination, by the Court on the record.

[3] In order to accommodate Holloman's schedule, the parties agreed to calling her to testify out of order, subject to later recall. Ms. Holloman, with the Court's permission and with no objection from the parties, appeared via Zoom videoconference technology from her residence in Michigan.

[4] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing conducted on May 17, 2022, which is located on the section of the Court's intranet site for FTR recordings.

### B.  Testimony of Sergeant Detective Andrew Myers

The Government first called Sergeant Detective Andrew Myers ("Myers") of the Noble County, Ohio Sheriff's Office to testify. [9:26:15-9:26:56]. Myers is a Sergeant Detective who has been specifically assigned to handle narcotics-related investigations. [9:27:23-9:27:37]. Myers is familiar with Defendant Mack as a subject in narcotics-related investigations in years past in Noble County and surrounding Ohio counties, such as Washington County. [9:27:38-9:27:58].

In fall of 2021, the Noble County, Ohio Sheriff's Office began investigating a drug house in Noble County. [9:28:40-9:28:54]. During a July 26, 2021 jail debrief interview with a confidential informant ("CI"), the CI described to Myers that a "black male," who was the significant other of a woman named Tana Guiler ("Guiler"), was the possible source or supplier of methamphetamine for Guiler who was trafficking drugs in Noble County. [9:28:55-9:29:32; 9:45:19-9:46:15; 9:59:35-10:00:00; 10:00:43-10:01:07; 10:04:42-10:04:58]. Myers later identified that "black male" subject as Mack. [9:29:33-9:29:49]. The CI said the drugs could be bought from Guiler but did not provide reasoning as to why he thought Mack was the supplier. [9:29:50-9:30:07]. Myers did not have an extensive history with this CI; he only met with the CI once, and the CI only provided limited, uncorroborated information. [9:57:37-9:59:34; 10:00:01-10:01:30].

Surveillance of the Guiler residence began shortly thereafter. [9:30:08-9:30:14]. The earliest focus of the investigation was on Guiler, based upon information gained through controlled purchases that Guiler was distributing heroin. [10:03:33-10:04:34].

On August 3, 2021, Myers personally observed a grey Cadillac Escalade in the driveway of the Guiler residence.[5] [9:30:49-9:30:58; 9:43:40-9:44:18; 10:04:35-10:04:42]. Myers observed an African American male, consistent with the information that had been provided to Myers by

---

[5] *See also* Government's Exhibit No. 2, Affidavit. [ECF No. 36-2].

the CI. [9:44:25-9:45:18; 9:46:15-9:46:25]. Myers observed the male sitting in the backyard of the residence, talking on his cell phone. [9:46:49-9:47:08]. Myers did not observe any behavior consistent with drug trafficking by the African American male on that day. [9:46:26-9:46:48; 10:02:21-10:02:59]. Myers saw Guiler access the vehicle but did not see the male interact with the vehicle. [9:47:09-9:47:22]. Surveillance on August 3, 2021 lasted for approximately one hour; Myers did not observe any other individuals coming or going from the residence. [9:27:23-9:47:46]. Myers testified on cross examination that no physical evidence was collected from the Guiler residence, i.e., no "trash pulls" were performed. [10:01:51-10:02:21].

On or about August 4, 2021, other law enforcement officers from the Ohio drug task force observed the Cadillac Escalade driving on Marietta Road, near the Guiler Residence. They observed the license plate number and determined the vehicle was registered to Defendant Mack. [9:30:15-9:30:28; 9:47:47-9:49:43; 10:04:58-10:05:10].

Myers believes the grey Cadillac Escalade he observed was the vehicle that Defendant Mack was later driving during the October 29, 2021 traffic stop. [9:30:29-9:30:48; 9:54:53-9:55:07]. In past investigations, Defendant Mack's *modus operandi*, or tactic, was to settle in with someone local to Noble County, travel to Detroit, Michigan to get large quantities of drugs, bring those drugs back to Noble County, and have the local individuals redistribute those drugs. [9:30:59-9:31:37; 10:05:11-10:05:17]. Defendant Mack went to prison once based on these tactics, and evidence was gathered by the drug task force Myers works with. [9:31:38-9:31:50].

After identifying Mack's vehicle, Myers went to a judicial officer seeking a warrant for a GPS tracker on the vehicle. Myers obtained a GPS-tracking warrant for forty-five days, then sought an extension and further delay of notification for that GPS-tracking warrant. [9:31:51-

9:33:24].[6] The affidavit in support of the warrant was written by and presented to the judicial officer by Myers. [9:33:25-9:33:40]. After obtaining the tracker warrant, the vehicle was next observed by Myers when law enforcement placed the tracker on the vehicle while it was parked at the Guiler residence. [9:49:44-9:50:53].

Law enforcement began monitoring Mack's travel in the vehicle; they observed that Mack's vehicle was driving around Noble County, Ohio area, making trips to Detroit, Michigan and to the Elkins, West Virginia area. [9:33:41-9:35:11; 9:28:26-9:28:39; 9:50:54-9:51:51]. Myers testified he could not be certain who all may have access to the vehicle or who was the driver of the vehicle on the trips to Detroit, MI; Ellenboro, West Virginia; or the Elkins, West Virginia area. [9:56:31-9:57:37]. Surveillance was performed on the vehicle in the Zanesville, Ohio area; officers were able to take a photograph of Mack as he finished driving and stepped out of the vehicle.[7] [9:51:52-9:54:52; 10:05:17-10:05:44]. Myers later saw this photograph himself. [10:05:45-10:05:50]. Myers noted that Mack was traveling to Elkins on a frequent, weekly basis. [9:35:12-9:35:22; 10:05:51-10:06:01].

Noble County, Ohio Sheriff's Office contacted the local drug task force in West Virginia and soon realized they too had information about the Cadillac being in the area. [9:35:23-9:35:43]. The law enforcement agencies decided to meet to share information in this matter. On October 26, 2021, Myers traveled to Elkins, West Virginia to take part in the meeting at the Randolph County Sheriff's Department with the Mountain Region Drug Task Force regarding the movements of

---

[6] *See* Government's Exhibits 2 and 3, [ECF No. 36-2 and 36-3].

[7] A copy of this photograph was requested at the hearing by counsel for the Defendant. AUSA Warner proffered that he believed the photograph had already been disclosed as part of discovery, but following the hearing, the Government would be certain to identify and resend the photograph along to counsel for the Defendant or provide the photograph as a supplemental discovery disclosure to Defendant and provide notice of the same to the Court. On May 19, 2022, the Government filed its Notice of First Supplemental Discovery Disclosure and notified the Court that the requested photograph was provided to counsel for the Defendant. [ECF No. 38].

Defendant Anthony Mack. Myers, Joshua Tallman, and Patrolman Sayre of the Elkins Police Department were all in attendance. [9:27:58-9:28:25; 9:35:44-9:36:52]. Myers provided the other agencies and officers with all of the information he had on Mack. [10:06:02-10:06:15].

After Myers left the meeting and was on his way back to Ohio, he was monitoring the GPS tracker and saw Mack traveling south towards Elkins. Law enforcement set up wide surveillance to account for poor cell phone service in this area, began to "tail" or follow Mack's vehicle south, and Myers notified the local task force, including VanMeter and Josh Tallman, who could then intercept and follow Mack once he was in the Elkins area. [9:36:53-9:38:11]. During the drive south towards Elkins, Mack stopped for gas and Myers observed Mack as the driver of the vehicle; Myers knew it to be Mack based on the physical description of him from records identifying him as the registered owner of the vehicle. [9:55:07-9:56:30].

### C.  West Virginia State Police Corporal and MRDTF Agent Joshua Tallman

The Government next called West Virginia State Police Corporal Joshua Tallman ("Tallman") to testify. Tallman is an Investigator with Bureau of Criminal Investigations assigned to the Mountain Region Drug and Violent Crime Task Force ("MRDTF") to testify. [10:07:19-10:07:43]. Tallman is the case agent responsible for investigating Mack. [10:07:44-10:07:52].

Tallman's investigation of Mack began on September 23, 2021 after a search warrant on another suspected "drug house" located at 55 Genesis Lane, Coalton, Randolph County, West Virginia. [10:07:53-10:08:03; 10:22:50-10:23:04]. The search warrant was drafted midday on September 23, 2021 after a series of controlled buys were executed at the house. [10:08:04-10:08:54; 10:24:13-10:24:35; 10:24:59-10:25:07; 10:25:14-10:25:31].

Shortly thereafter, MRDTF Commander David Vanmeter received information from a former task force agent Gene Smithson, that an Ohio point of contact, associated with a local Ohio drug task force, that a GPS tracker had been placed on a Cadillac Escalade belonging to Anthony

Mack and the Cadillac Escalade was presently in the area where MRDTF agents were about to execute the search warrant. [10:08:55-10:10:07].

Sergeant D'Weise ("D'Weise") of the West Virginia State Police lives near the 55 Genesis Lane residence. His wife observed Mack's vehicle parked in the driveway, an unknown vehicle to her, and called D'Weise to check it out. D'Weise responded, stopped the vehicle based upon an observed traffic violation, and identified the driver as Anthony Mack and noted there was another African American male in the passenger seat. D'Weise ran the vehicle information and Mack's driver's license number through the communications center during the traffic stop and issued a warning for the traffic violation to Mack. [10:10:08-10:11:08; 10:25:40-10:28:57]. Both Smithson and D'Weise contacted Tallman and provided this information to him midday on September 23, 2021 as Tallman was preparing the search warrant application and affidavit. [10:11:09-10:11:21]. Prior to this date, Tallman had no knowledge of the Cadillac Escalade. [10:23:05-10:23:16]. Tallman did not personally observe the Cadillac Escalade that day. [10:23:34-10:24:12; 10:25:08-10:25:13].

Upon a search of the residence, law enforcement found drug use paraphernalia, digital scales, and a powder substance consistent with heroin or fentanyl. [10:11:22-10:11:49]. During the search warrant execution, Tallman also interview two people on scene – Patricia Noel and Andre "Dre" Johnson, III. Noel was the main target of the investigation. Upon questioning about the Cadillac Escalade, Noel stated she didn't know their names, but two black males brought "dope" to the house on the same date, September 23, 2021. Noel stated she saw one of the men give methamphetamine to Dre. [10:11-50-10:13:17; 10:23:17-10:23:33; 10:24:36-10:24:58; 10:28:58-10:29:48; 10:30:28-10:30:53; 10:31:48-10:32:27]. Dre was not there at the beginning of the search, but later returned to the residence. Dre was resistant to speak with officers, but he knew one of the

officers on scene and remarked that "you guys need to be careful; these guys are from out of state, with connections to Detroit, and I don't want to see anyone get hurt." [10:13:18-10:13:50; 10:29:49-10:30:27].

On or about September 24, 2021, an interview was conducted with Sean Complin[8] who said Noel and Dre would talk about the African American men bringing drugs from Detroit, but he provided no names. [10:30:54-10:31:47].

On October 26, 2021, Tallman was present at a meeting among task force officers, including Andrew Myers and Officer Sayre of the Elkins Police Department, where the main topic of discussion was Mack's travels to the Elkins, West Virginia area to sell drugs. [10:13:41-10:14:18; 10:14:50-10:15:00; 10:19:11-10:19:27]. Ohio officers discussed their tracker warrant and local Elkins law enforcement shared information they had collected through various sources. There was information provided by Officer Sayre that Mack transported drugs inside his car inside a large McDonald's cup or other cup and would dump water on it if stopped by police. [10:14:19-10:14:49]. Officer Sayre also provided information at the meeting that 49 Ash Lane, Apt. 8 served as a "stash house" for Mack, where Mack would store drugs. Sayre had two contacts or "sources" who provided him information about Mack [10:15:00-10:16:17].

On the same day, October 26, 2021, Tallman conducted surveillance and observed Mack's vehicle around the Elkins area. Tallman began to follow the vehicle and followed Mack to two separate apartment buildings. [10:32:27-10:32:51]. Mack first stopped at Gateway Apartments, then stopped at the apartments on Ash Lane. [10:17:00-10:17:13].

Gateway Apartments is known for drug activity. Tallman has personally searched apartments at Gateway Apartments and seized drugs. [10:17:14-10:17:35]. It was dark so Tallman

---

[8] The proper spelling of this individual's name was not put onto the record and is unknown by the undersigned.

could not positively identify the driver, but Tallman observed an individual rapidly exit Gateway Apartments and return to the Cadillac Escalade. The short time frame during which the Escalade was at the Gateway Apartments was consistent with a drug deal. [10:17:36-10:18:23; 10:32:52-10:33:25].

Then, Tallman observed the vehicle drive to 49 Ash Lane where the driver stopped in front of the apartment, went inside for a short time, and then return to the Escalade. This is consistent with the information provided at the earlier Mack task force meeting by Sayre – Sayre reported this source gave information that this apartment was a drug storage location. [10:18:24-10:19:10].

As Myers was driving home on October 29, 2021, he received information from the GPS tracker that Mack was headed towards Elkins, West Virginia. Myers turned around to follow Mack via vehicle and contacted Tallman to tell him about Mack's movements. [10:16:18-10:16:44; 10:19:27-10:19:35]. Tallman asked Myers to follow until Tallman could intercept and follow in his own vehicle and take lead. [10:16:45-10:16:59]. Tallman then called Lieutenant Cale and Officer Sayre to let them know Mack was headed into the Elkins area and to ask them to be prepared in case a traffic stop was able to be conducted. Tallman specifically contacted Lt. Cale because Cale is a K9-Handler, and Tallman wanted Cale and his dog to be in the area based upon Mack's suspected drug trafficking activity. Tallman contacted Sayre because Sayre was familiar with the case, at the October 26 meeting, and was an on-duty Patrolman in Elkins. [10:19:36-10:20:42].

At some point, Tallman lost contact with Mack's vehicle, but Officer Sayre had begun to follow Mack's vehicle and observed Mack's vehicle commit the traffic violation of crossing the center line. [10:20:43-10:21:31]. Sayre called Tallman, advise him of the traffic violation of crossing the center line, and asked if Tallman wanted them to perform a traffic stop on the vehicle

and Tallman directed "yes, stop the vehicle." Tallman directed the stop of the vehicle because, "based off everything, the totality of all the circumstances," "there was a good belief based on his past history and the GPS tracking information that there would be drugs in the vehicle." [10:20:42-10:21:52; 10:33:25-10:34:06; 10:34:52-10:35:22]. Tallman noted that the vehicle was observed in the area recently at apartments with known drug trafficking activity, Mack's vehicle recently went to Detroit, MI and it was believed he may be bringing a large quantity of meth into the area. [10:34:07-10:34:51]. Tallman testified on cross-examination that there were no specific sources or informant information that Mack had received a quantity of drugs on that day to bring to West Virginia or that Mack was bringing drugs to Elkins, West Virginia on that day. [10:34:52-10:36:58]. Tallman was not on the scene as the traffic stop initially occurred. [10:21:52-10:22:12].

### D.  Patrolman Daniel T. Sayre of the Elkins Police Department

The Government next called Patrolman Daniel T. Sayre ("Sayre") of the Elkins Police Department to testify. [10:50:03-10:50:25]. Sayre has been a police officer for approximately seven years. [10:59:34-10:59:36].

On October 26, 2021, Sayre attended a meeting in Elkins, West Virginia alongside individuals from an Ohio drug task force and the Mountain Region Drug Task Force, including Sgt. Joshua Tallman, to discuss Defendant Mack. [10:50:30-10:50:58].

Sayre shared information regarding Mack at the meeting which Sayre had received from a local source. Specifically, Sayre had received information from his source that Mack was transporting controlled substances from Ohio into Elkins, West Virginia and that Mack kept the controlled substances in Styrofoam cups. [10:50:59-10:51:48]. Some of the information Sayre was provided by this source matched information that Ohio task force officers had independently gathered. For example, Sayre's source indicated that Mack would wear a construction vest whenever he would make "drops" in an attempt to blend in. At the meeting, Myer told Sayre that

this matched up with information from his sources in Ohio, and further, Myer said he had seen Mack in a construction vest. [10:51:49-10:52:53; 11:14:01-11:14:54; 11:16:46-11:16:53; 11:17:16-11:18:34].

Sayre's source further told him that the apartments at 49 Ash Lane were used as a "drop point" or safe house for Mack to store his drugs. [10:52:54-10:53:53]. The source knew this because the source personally observed Mack at 49 Ash Lane. [11:14:55-11:16:11]. Sayre's source told Sayre that Mack was from Ohio and drove a blue[9] in color Cadillac with Ohio "tags." [10:53:53-10:54:24; 11:16:54-11:17:08]. Sayre believed his conversations with the source occurred in the month of October 2021. [11:05:39-11:06:54]. Sayre's conversations with the source began after the source reached out to Sayre with information and indicated the source was close with Mack and had information. [11:06:55-11:08:27]. Sayre was familiar with the source and knew the source for a few years, having arrested this individual in the past. Sayre believes this person to be sober now, though they've used drugs before. [11:08:28-11:10:32].

The source used a nickname for Mack – "Amp." The source indicated that there was an additional male who was with Mr. Anthony Mack – later identified as Darwin Mack. [11:10:33-11:11:14]. The source also provided suspected phone numbers for Mack, which were passed along to the MRDTF but have not been verified. [11:16:11-11:16:45]. The source indicated to Sayre that Darwin Mack and Anthony Mack would drive separate vehicles when they came into Elkins.

---

[9] Sayre testified his source was sure the Cadillac Escalade was blue. [11:17:08-11:17:16]. However, the testimony and exhibits in this case are inconsistent as to actual color of the vehicle. *Compare* Government's Exhibit 1, [ECF No. 36-1 at 2 ("I . . . observed Elkins Police Department on a traffic stop with a **dark colored** Cadillac Escalade.")]; Government's Exhibit No. 2, [ECF No. 36-2 at 1, 3 ("2020 Model Cadillac Escalade, **Grey**" "2020 Cadillac Escalade **Gray In Color**" "we observed a **Gray** Cadillac Escalade"); Testimony of Lt. Cale, *infra* at 21, "a **dark blue** Escalade," [11:37:06-11:38:14]; and Testimony of Sgt. Det. Myers, *infra* at 9, "personally observed a **grey** Cadillac Escalade," [9:30:49-9:30:58; 9:43:40-9:44:18; 10:04:35-10:04:42]. The undersigned find these inconsistencies to be minor discrepancies regarding the color of the vehicle and not determinative of the outcome in this case.

[11:11:15-11:11:52]. Darwin Mack was also from Ohio. [11:11:53-11:12:01]. Sayre was not sure how or if Darwin Mack and Anthony Mack are related, but he stopped Darwin Mack driving a rental white Jeep Cherokee with Massachusetts "tags" for a traffic stop based upon the violation of speeding. [11:12:14-11:13:14]. During the traffic stop of Darwin Mack, Sayre received driver's license information for Darwin Mack and issued a warning. [11:12:02-11:12:14]. Sayre did not learn anything about drugs or drug trafficking from Darwin Mack. [11:13:14-11:14:00].

Later, after meeting with his source and while on routine patrol, Sayre also personally observed Mack in his Cadillac in Elkins, West Virginia at 49 Ash Lane. Sayre watched Mack exit this vehicle, go upstairs to an apartment, then return to his vehicle. [10:54:25-10:55:16].

On October 29, 2021, Sayre learned, from communications between the Noble County, Ohio task force and the MRDTF agents, that Mack was headed into Elkins. [10:55:17-10:56:14]. Sayre and Officer Summerfield of the Elkins Police Department communicated with Sgt. Tallman and setup to see if they could see Mack coming into Elkins. Sayre first observed Mack's vehicle on Harrison Ave. in Elkins, near Sears going towards Route 33. [10:56:15-10:57:47; 11:18:56-11:19:14].[10] This was approximately two or three miles from where the later traffic stop would occur. [10:57:48-10:57:59; 11:19:15-11:19:29].

Sayre pulled out behind Mack's vehicle and continued to follow him until "the Third Ward turn" by Davis Medical on Harrison Avenue. [10:58:00-10:58:25; 11:19:30-11:20:08; 11:20:22-11:20:54]. Sayre was approximately three car lengths behind Mack's vehicle while following. [11:20:55-11:21:04]. There were all green lights while the vehicles were driving. [11:21:05-11:22:03]. Sayre observed Mack's vehicle drive left of center over the double yellow line while going around the turn. The vehicle then corrected and returned into the proper lane and proceed to

---

[10] *See* Government's Exhibit 4, [ECF No. 36-4].

drive from Harrison Avenue to Randolph Avenue after the next intersection. [10:58:26-10:59:12; 11:22:18-11:22:31; 11:27:57-11:29:58]. Mack was left of center for the entire length of the turn, approximately two Escalade car lengths. [11:31:26-11:32:30].

The road conditions were damp; Sayre did not recall any construction or potholes on the road at the time. [11:22:32-11:23:06; 11:23:45-11:23:57]. Sayre testified that the vehicle went so far left of center that approximately half of the vehicle was in the opposite lane. Sayre further testified that this is a violation of West Virginia State Code. [10:59:13-10:59:33]. Sayre didn't observe any other traffic violations. [11:29:58-11:30:46; 11:31:13-11:31:26]. There were other cars on the road at the time traveling in the opposite direction of Mack and Sayre, but none were on the turn at the time of crossing the center line. If there had been another vehicle in the turn, in Sayres' opinion, Mack's vehicle would have struck that vehicle. [11:23:06-11:23:45; 11:32:31-11:33:20].

Sayre testified on cross-examination that he was uncertain whether Mack recognized Sayre's vehicle as a marked police vehicle as he was following behind Mack's vehicle. [11:23:46-11:25:48]. Sayre couldn't tell if the driver or passenger were nervous or looking back in the rearview. [11:25:50-11:27:57].

This traffic stop gave Sayre a basis to stop the vehicle, but he didn't do so immediately. Sayre called Tallman, reported that Mack had committed the traffic violation of crossing the center line, then they decided Sayre should initiate a traffic stop. Sayre informed Tallman because he knew the task force was attempting to build a case against Mack. Sayre initiated his emergency lights at the intersection in order to initiate the traffic stop. [10:59:37-11:00:32]. Sayre did not have a dash camera in his vehicle on the day of the traffic stop, nor did he have a body camera, but he hopes to have such technology in the future. [11:33:21-11:34:06].

Mack did not pull over immediately. [11:00:33-11:00:46]. Sayre believes Mack had opportunities to pull over sooner but did not do so. [11:30:47-11:31:12]. He continued to travel from the Walgreens intersection at Harrison Avenue and Randolph Avenue to Subway on Randolph Avenue, approximately 200-300 yards. It was dark outside, but not yet raining; Sayre continued to have his emergency lights flashing as he followed behind to stop Mack's vehicle. [11:00:47-11:01:20].

The vehicle pulled over; Sayre observed a driver, Mack, and a female passenger shuffling around in the center console area of the vehicle. [11:01:21-11:01:45; 11:20:08-11:20:21]. Sayre radioed out to Randolph County 9-1-1 to inform them of the traffic stop; it was 10:23 p.m. on October 29, 2021. [11:03:55-11:04:25]. As Sayre approached the vehicle, Sayre advised Mack to roll the back window down, and he complied with the request. Sayre advised Mack why he was being stopped, and while speaking with him, Sayre noted that Mack seemed very nervous – his carotid artery was visibly pumping. Sayre asked Mack to step out of the vehicle, for safety purposes. Because of Mack's actions of digging into the center console and because of how nervous he was, Sayre also thought he might be attempting to hide something. [11:01:46-11:02:20]. Mack exited the vehicle; Sayre continued to speak with him and patted Mack down. [11:02:21-11:02:32]. Mack began to pace back and forth and tried to get back in the vehicle by opening the door. Sayre explained that he could not get back in the vehicle. Mack continued to pace back and forth while Sayre spoke to him. Sayre eventually placed Mack into hand restraints, detained him, and placed him into a patrol car. [11:02:33-11:03:28].

Around this time, at approximately 10:33 p.m., Lt. Cale was arriving on scene with his dog. [11:03:29-11:03:36; 11:04:25-11:05:05]. Once Mack was secured in a patrol car, Sayre spoke with Lt. Cale and other officers on scene. [11:05:06-11:05:20]. Lt. Cale deployed the dog. Once the dog

had a positive indication, Sayre and others began to search the vehicle. [11:05:21-11:05:29]. Mack was not wearing a construction vest during the traffic stop, but a construction vest was recovered from the Cadillac and appeared to be the same one Sayre had previously seen Mack wearing. [11:18:34-11:18:55]. It began to rain as the investigation continued. [11:22:03-11:22:17].

### E.  Lieutenant and K9-Handler Dustin Cale of the Philippi Police Department

The Government next called Lieutenant and K9-Handler Dustin Cale ("Cale") of the Philippi Police Department to testify. Cale has worked for the Philippi Police Department for approximately ten years. [11:35:37-11:35:49]. Cale is presently assigned to the K9-Unit where he works with his certified and trained canine, Raptor. [11:5:50-11:36:08].

On October 29, 2021, Cale received a phone call from Tallman stating that there was a vehicle coming to the Elkins, West Virginia area which was possibly hauling methamphetamine; Tallman requested that Cale and Raptor respond to the Elkins, West Virginia area in the event that they were able to locate the subject vehicle. [11:36:09-11:36:52]. Cale drove to Elkins with his dog; it took approximately fifteen minutes to arrive in Elkins. [11:36:52-11:37:05]. Cale saw an Elkins Police Department Unit at the gas station next to the local DMV. Cale stopped to speak to the patrol officer. While speaking with the officer, Cale overheard a call on the Elkins patrol officer's radio that a vehicle similar to the one described to Cale by Tallman, a dark blue Escalade, had been pulled over on a traffic stop. The Elkins patrol unit vehicle left, and Cale followed him to the traffic stop. [11:37:06-11:38:14].

It took approximately one minute for Cale to get from that location to the traffic stop. Cale's K9 Deployment Report reflects that Cale got the call from Tallman at 10:23 p.m.; Cale arrived on scene at the traffic stop at approximately 10:33 p.m. [11:38:15-11:39:55]. Once arriving on scene, Cale exited his vehicle, observed several marked Elkins Police Department vehicles and made contact with Corporal Sayre and Anthony Mack. [11:39:56-11:40:11]. Cale observed Sayre

21

speaking to Mack; Mack was very nervous, pacing around, and was subsequently detained. It began raining very hard and the wind was picking up. [11:40:12-11:40:26].

Cale detected the odor of marijuana at this time as he walked to the back of the vehicle. [11:40:27-11:40:44]. As Cale approached the vehicle, he noticed there was a female occupant in the passenger seat; and she was asked to exit the vehicle so Cale could conduct an open-air sniff of the vehicle using canine Raptor. [11:40:45-11:41:09]. Cale began this open-air sniff with Raptor approximately two minutes after arriving on scene. They began at the rear of the vehicle. Raptor began and proceeded to the right passenger side of the vehicle where he began to bracket between the doors, change breathing patterns, and sat down and began scratching between the front and back passenger doors. This was an alert for the presence of drugs in the car. [11:41:10-11:42:05]. Cale participated in the search of the vehicle. Marijuana was found in the vehicle. [11:42:06-11:42:24].

### F.  Defendant Anthony Dwayne Mack

Counsel for the Defendant next called the Defendant Anthony Dwayne Mack ("Mack") to testify.  [11:47:00-11:49:24].[11]

On October 29, 2021, Mack was driving a Cadillac Escalade into the Elkins, West Virginia area. [11:49:24-11:49:50]. At some point while driving, Mack looked in his rearview mirror and noticed that a marked police vehicle was behind his vehicle. [11:49:51-11:50:01; 11:54:24-11:54:45]. Mack was uncertain if the vehicle was following him or if he was just performing routine traffic patrol. [11:54:46-11:55:07]. Mack was not nervous that the police vehicle was behind him. [11:55:31-11:56:57].

---

[11] The Court advised Defendant of his constitutional rights, particularly his right to remain silent under the Fifth Amendment of the U.S. Constitution. Defendant stated, on the record, that he had spoken to his attorney regarding his constitutional rights and still wished to testify on his own behalf; counsel for the Defendant confirmed the same.

Mack believes the police vehicle drove behind him for several minutes before turning on his emergency lights to initiate the traffic stop. [11:50:02-11:50:34; 11:55:08-11:55:30]. Mack was crossing a traffic intersection near the Walgreens when the officer turned on his emergency lights; Mack did not see a place to pull his vehicle over, so he drove for another minute or so before pulling over near a Subway. [11:50:35-11:51:09].

Mack testified he clearly remembers the period of time when he was driving. He remembers paying close attention to the road and driving carefully. He believes he never crossed over or touched the center line of the road while driving [11:51:10-11:52:57; 11:56:57-11:57:45]. Mack further believes he committed no other traffic violations while driving on October 29, 2021. [11:52:58-11:53:07].

### G.  Oral Arguments

At the hearing, counsel for the parties provided oral argument as to the motion to suppress. Counsel for the Defendant noted that Defendant disputes the existence of the alleged traffic violation and further noted that, even if the Court finds that a traffic violation did occur, Defendant disputes that one isolated traffic violation would be sufficient for a stop in this case. [12:03:04-12:03:46]. Counsel argued that Shelby Holloman's testimony as a passenger in the car on the day of the traffic stop corroborates the testimony of Defendant Anthony Mack. [12:03:47-12:04:49]. Defendant disagrees with the Government's argument that the totality of the evidence created reasonable articulable suspicion or probable cause to support that Defendant Mack was in the vehicle or trafficking drugs in his vehicle on October 29, 2021. [12:04:50-12:06:42]. Counsel for the Defendant argued that the reasonable articulable suspicion must be particularized such that the officer who performed the traffic stop had reasonable articulable suspicion that there was criminal activity afoot on that day, at that time, associated with that vehicle. [12:07:09-12:08:35].

Counsel for the Government argued that there were two independent bases justifying the traffic stop on October 29, 2021: (1) the observed traffic violation, and (2) reasonable suspicion that there were drugs in the car. [12:06:43-12:06:56]. Counsel for the Government noted that the reasonable suspicion standard is a low standard and argued that, in this case, the entirety of the investigation created reasonable suspicion which justified stopping the vehicle. [12:06:57-12:07:08]. Counsel for the Government argued that the reasonable suspicion here was specific to this day, based upon Mack's observed prior behavior, that his travel to Elkins was likely travel for drug trafficking; counsel for the Government argued that officers' reasonable articulable suspicion of drug trafficking, alone without the traffic violation, would justify a traffic stop. [12:08:36-12:09:43].

Counsel for the Government further stated that there were three reasons to search the car once it had been stopped: (1) the K9-Handler, Cale, smelled marijuana upon approaching the vehicle; (2) the timely drug alert on the car, indicating the presence of controlled substances; and (3) the totality of the circumstances in light of the investigation created probable cause to search the vehicle, especially in light of Mack's nervous behavior and fumbling around in the center console. [12:09:44-12:10:31]. Counsel for the Defendant stated that Defendant does not dispute that there was justification to search the car after the traffic stop began; counsel for the Defendant clarified that Defendant only disputes whether the traffic stop itself was justified at its inception and the rationale for the traffic stop. Defendant contends the stop itself does not satisfy the Fourth Amendment. [12:10:32-12:11:06].

## IV. APPLICABLE LAW

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

amend. IV. Further, longstanding caselaw provides that "[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A law enforcement officer is permitted to stop a vehicle when the officer observes a vehicle violating a traffic law. *See* United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); *see also* United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. *See* Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only . . . where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### V. LEGAL ISSUES AND ANALYSIS

The issues before the Court are whether the traffic stop of Defendant's vehicle was lawful based upon either (1) the observed traffic violation and/or (2) based upon reasonable suspicion of criminal activity – specifically, drug trafficking, and (3) whether deputies lawfully extended the traffic stop to conduct a canine sniff.

**(1) The undersigned finds that officers' traffic stop of the Escalade was legitimate from the outset and lawful based upon an observed traffic violation.**

A police officer stopping an automobile is a seizure. Such a stop must arise from the officer's probable cause, if not at least reasonable suspicion, to do so. Under longstanding precedent, there is a two-pronged inquiry for the Court here: (1) whether, at the outset, law

enforcement's action was legitimate, and (2) whether law enforcement's activities during the stop are reasonably related to the stop. *See* Terry v. Ohio, 392 U.S. 1 (1968); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011); United States v. Vaughn, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017).

The Supreme Court has established that law enforcement's stop of an automobile is reasonable if the officer has probable cause that there has been a traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996). "When an officer observes a traffic offense—however minor— he has probable cause to stop the driver of the vehicle." United States v. Hassan El, 5 F.3d 726, 729 (4th Cir. 1993); *See also* United States v. Junkins, No. 2:18-CR-30, 2019 WL 2283921, at *3 (N.D.W. Va. May 29, 2019) (Bailey, J.) (A "traffic stop is reasonable based upon the officer's observation of the defendant's traffic offense"), *aff'd*, 860 F. App'x 297 (4th Cir. 2021); United States v. Cervi, No. 5:15-CR-40, 2015 WL 13735783, at *4 (N.D.W. Va. July 29, 2015) (Seibert, J.), *report and recommendation adopted*, No. 5:15-CR-40, 2015 WL 5598420 (N.D.W. Va. Sept. 21, 2015). "[I]f a traffic stop is objectively justified ... the officer's motive, whether pretextual or not, will not render the stop illegal." Hassan, 5 F.3d at 729–31. *See also* United States v. Jeffus, 22 F.3d 554 (4th Cir.1994); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 1992) ("Any ulterior motive [that] a police officer may have for making the traffic stop is irrelevant.").

The undersigned notes that in the plethora of caselaw surrounding traffic stops, there is some confusion about the applicable standard – probable cause or reasonable suspicion – for such police activity, depending on the facts at hand. To be clear though, in this case, the undersigned finds that Patrolman Sayre had probable cause to initiate the traffic stop, and as such, also met the less-stringent reasonable suspicion threshold.

Here, Patrolman Sayre personally observed the Cadillac Escalade commit the traffic violation of crossing the center line, entering into the lane of oncoming traffic as Mack's vehicle made the "Third Ward turn." In his testimony, Patrolman Sayre cited concerns that if another vehicle had been in the opposite lane, Mack's vehicle would have struck it based on how far left of center he deviated while going around the turn. Corporal Tallman's testimony corroborates that on October 29, 2021, just before the traffic stop, Patrolman Sayre called him and reported that he observed Mack's vehicle commit the traffic violation of crossing left of center.

There is contrary testimony from Defendant Anthony Mack that he firmly believes he never crossed over or touched the center line of the road. Ms. Shelby Holloman also testified that she never observed a traffic violation be committed from where she was sitting in the front-seat passenger position.

However, the undersigned finds the testimony of Patrolman Sayre to be most credible. As he followed behind the Cadillac Escalade and both vehicles rounded the "Third Ward turn," Patrolman Sayre would have had the best perspective to observe whether Mack's Cadillac Escalade did, in fact, touch or cross over the center line. Despite Defendant's arguments to the contrary, one isolated traffic violation, when observed by law enforcement, is sufficient to conduct a traffic stop. Hassan El, 5 F.3d at 729 (4th Cir. 1993).

The undersigned would further note that even if Officer Sayre were mistaken as to how far left of center Defendant Mack's vehicle was, this mistake of fact likely would not undermine his finding of probable cause if the mistake was reasonable. See United States v. Mubdi, 691 F.3d 334, 342 (4th Cir. 2012), cert. granted, vacated on other grounds, 570 U.S. 913, 133 S. Ct. 2851, 186 L. Ed. 2d 902 (2013) (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("[i]f an officer makes a traffic stop based on a mistake of fact, the only question is whether

his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers[.]"). It is possible that Patrolman Sayre observed the Cadillac Escalade veer only slightly to the left and make contact with the center yellow line. Regardless, there is an entire body of caselaw which supports giving great deference to trained law enforcement who observe a traffic violation, such as crossing left of center.

There is no reason in this case to discredit Patrolman Sayre's account of the traffic violation. Patrolman Sayre repeatedly explained, in his testimony, and in his statements to Corporal Tallman via phone call on October 29, 2021, that he believed he had reason to pull the vehicle over for a traffic violation of crossing left of center. In sum, the undersigned **FINDS** that the traffic stop was justified at the inception based upon the observed traffic violation.

> **(2) Moreover, the traffic stop of the Escalade was lawful based upon reasonable articulable suspicion that Defendant Anthony Mack was engaged in drug trafficking.**

The reasonable suspicion standard is governed by the United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968) and its progeny. "Terry's 'reasonable suspicion' standard is 'less demanding ... than probable cause.'" Illinois v. Wardlow, 528 U.S. 119, 123 (2000); *see also* United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (The "proof necessary to demonstrate 'reasonable suspicion' is 'considerably less than [a] preponderance of the evidence.'") (quoting Wardlow, 528 U.S. at 123). In order to justify a Terry stop, "a police officer must simply point to specific and articulable facts, which taken together with rational inferences from those facts," which evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity.'" Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 21, 27); *see also* Branch, 537 F.3d at 337.

Moreover, "reasonable suspicion' is a 'nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. (citing Ornelas v. United States, 517 U.S. 690, 695 (1996). *See also* United States v. Miller, No. 1:19-CR-41, 2019 WL 6461335, at *5 (N.D.W. Va. Sept. 4, 2019), report and recommendation adopted in part, rejected in part, No. 1:19CR41, 2019 WL 4254910 (N.D.W. Va. Sept. 9, 2019); United States v. Gaston, No. 1:19-CR-55, 2019 WL 12023243, at *9 (N.D.W. Va. Nov. 19, 2019), report and recommendation adopted, No. 1:19-CR-55, 2021 WL 1254678 (N.D.W. Va. Apr. 5, 2021). To support a finding of reasonable suspicion, a court must require the detaining officer "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (quoting United States v. Foster, 634 F.3d 243, 248 (4th Cir.2011)). The court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted)). An "officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008)

Factors that could form the basis for a reasonable suspicion of drug trafficking, include, but are not limited to, "prior traffic stop of the [same vehicle] in a drug-trafficking area," U.S. v. Branch, 537 F.3d 328 (4th Cir. 2008), and an informant's tip that a suspect was involved in distribution, U.S. v. Roach, 447 Fed.App'x. 993, 2012 WL 14844150 (4th Cir. 2012). *Cf.* United States v. Williams, 808 F.3d 238, 243 (4th Cir. 2015) (driving a rental car, traveling on a "known

drug corridor at 12:37 a.m.," and differing stories as to travel plans did not add up to reasonable suspicion).

In the instant case, numerous factors support reasonable suspicion that Defendant Mack was involved in drug trafficking, and further, that Defendant Mack was likely in the Elkin area on October 29, 2021, to engage in criminal activity. In particular, an informant source in the Elkins community, who detaining officer Sayre has known for multiple years, recently provided information that Mack was using an apartment located at 49 Ash Lane as a "drop point" or safe house for illegal drugs when he came to the Elkins area. The informant further provided information that Defendant Mack would wear a construction vest to blend in whenever "making drops." Thereafter, Sayre's personally observed Defendant Mack and his Cadillac Escalade at 49 Ash Lane, corroborating his informant's information. Additionally, the informant's information was further corroborated at the October 26, 2021, meeting between task forces wherein Myer told Sayre and others that the task force in Noble County, Ohio was investigating Defendant Mack for drug trafficking and also had information that Mack wore a construction vest when driving between locations. Moreover, Sayre was informed at the October 26 meeting that Noble County law enforcement officers were GPS tracking the vehicle registered to Defendant Mack between Detroit, Michigan, southeastern Ohio, and the Elkins, West Virginia area, and based on the data of the vehicle's movement, believed that Defendant Mack was engaged in drug trafficking.

"Particularized, articulable facts are always required" under the Fourth Amendment to justify a Terry stop. United States v. McCoy, 513 F.3d 405, 415 (4th Cir. 2008). Here, Patrolman Sayre had reasonable, articulable suspicion of drug trafficking activity sufficient to stop Defendant Mack's vehicle, regardless of the observed traffic violation of crossing the center line. *See also* McCoy, 513 F.3d 405, 415 (4th Cir. 2008) (It would have been "poor police work indeed," for an

officer of [his] experience to fail to investigate further given the numerous facts that strongly suggested, in light of his accrued knowledge of the drug trade, that a drug deal was afoot."). The The "ultimate test [is] reasonableness under the Fourth Amendment," United States v. McCoy, 513 F.3d 405, 415 (4th Cir. 2008) (citing Fla. v. Royer, 460 U.S. 491, 499 (1983). Because Patrolman Sayre had the requisite reasonable suspicion to stop Defendant Mack's vehicle and investigate suspected drug trafficking activity, the undersigned cannot say that that Patrolman Sayre's actions were unreasonable in any sense. Id. Patrolman Sayre was working in tandem with multiple state drug task forces to collect enough articulable facts and data to support an investigative stop of Defendant Mack's under suspicion of drug trafficking. "This is not a case of governmental overreaching, nor is it a case of a 'hunch' gone right. It is a case of an experienced police officer dutifully investigating and uncovering criminality well within the bounds of Terry." McCoy, 513 F.3d at 415.

Accordingly, because Patrolman Sayre had two separate bases – the observed traffic violation and the reasonable, articulable suspicion of drug trafficking activity – for stopping Anthony Mack's vehicle on October 29, 2021, the undersigned **FINDS** that the traffic stop was justified at its inception and satisfies the demands of the Fourth Amendment.

### (3) Officers had further reasonable articulable suspicion of criminal activity which justified extending the vehicle stop to conduct a canine sniff. Awaiting the drug dog's arrival was reasonable and created minimal intrusion.

Law enforcement may detain a vehicle while awaiting a drug dog's arrival and sniff, but the detention must be reasonable, with officers using "diligence in pursuing their investigation" and minimizing intrusion upon the suspect. United States v. McBride, 676 F.3d 385, 395 (4th Cir. 2012) (fifty-five-minute detention of vehicle in parking lot while awaiting arrival of drug dog was not unreasonable as officers were diligent in their active investigation). *See also* United States v.

White, 42 F.3d 457, 460 (8th Cir. 1994) (eighty-minute wait for canine narcotics unit was reasonable); United States v. Yang, 345 F.3d 650, 653–54 (8th Cir. 2003) (allowing for a more extended detention once defendant was allowed to drive to a more secure location). *But see* United States v. Place, 462 U.S. 696, 710, 103 S. Ct. 2637, 2646, 77 L. Ed. 2d 110 (1983) (ninety-minute detention of passenger and luggage was unreasonable seizure).

Here, the testimony and evidence support that the traffic stop was in no way extended in order to await the drug dog's arrival. Testimony supports that Lt. Cale and his canine Raptor were *en route* to the Elkins area prior to the occurrence of the traffic stop. Sayre initiated the traffic stop and approached the vehicle at approximately 10:23 p.m. Sayre was still speaking with Mack, trying to calm him down and detain him, when Cale arrived on the scene at 10:33 p.m. Passenger Shelby Holloman had not yet been asked to step out of the vehicle, and Sayre had not yet interviewed Holloman. Sayre was actively pursuing his investigation of the traffic stop and speaking with Mack while Cale was on his way to the scene. To the extent there was any waiting or extension of detention in anticipation of Raptor's arrival, the undersigned believes it to be minimal where Cale and canine Raptor arrived on scene just minutes later.

Moreover, counsel for the Defendant conceded, on the record during oral arguments, that once the traffic stop began, there was justification, or probable cause, to search the vehicle. As the Government noted, (i) the K9-Handler Cale smelled marijuana upon approaching the vehicle; (ii) the dog timely alerted to the presence of controlled substances; and (3) the totality of the circumstances, including the prior investigation as well as Mack's nervous behavior and fumbling around in the center console, supported a search of the vehicle for the presence of illicit drugs. Any further detention during the search was likewise reasonable and justified.

## VI. CONCLUSION

Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence, [ECF No. 21], be **DENIED**.

Any party shall have **fourteen (14) days** from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted June 21, 2022.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE