```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
```

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

    **v.**                                        **CRIMINAL NO. 2:22-CR-1**
                                                                                   **(KLEEH)**

**ANTHONY DWAYNE MACK,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]

Pending before the Court is a Report and Recommendation ("R&R") by United States Magistrate Judge Michael J. Aloi, recommending that the Court deny the motion to suppress filed by Defendant Anthony Dwayne Mack ("Mack"). For the reasons discussed herein, the R&R is **ADOPTED,** to the extent consistent with this order, and the motion to suppress is **DENIED.**

### I.   FACTS

The following facts are based upon the parties' briefs, the testimony and exhibits presented during the suppression hearing, and the parties' arguments during the hearing.

#### Ohio Law Enforcement and Mack

On July 26, 2021, Sergeant Detective Andrew Myers ("Myers") of the Noble County, Ohio, Sheriff's Office conducted an interview with a confidential informant ("CI"). The CI told Myers that a black male was the "significant other" of and possible source of

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 2 of 16   PageID #: 491

USA V. MACK                                                    2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
     [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

drugs for a woman named Tana Guiler ("Guiler"), who was trafficking drugs out of her house in Noble County, Ohio.

On August 3, 2022, Myers and other officers were conducting surveillance on Guiler's home. Myers observed a grey Cadillac Escalade in the driveway and a black male sitting in Guiler's back yard. The next day, members of the task force observed the same vehicle on Marietta Road, which is close to Guiler's house. At that time, they obtained the license number and did a registration check. They discovered that the vehicle was registered to Anthony Dwayne Mack, who is an African American male. The Noble County Sheriff's Office was familiar with Mack due to Mack's criminal history, which includes, but is not limited to, prior drug trafficking charges.

Myers sought and obtained a search warrant to place a GPS tracking device on Mack's vehicle at Guiler's residence. The tracking data revealed that the vehicle was making frequent trips to Elkins, West Virginia. It was also making trips to Detroit, Michigan. Myers noticed that the pattern of the vehicle's travel was similar to the pattern of Mack's travel in prior cases. Mack had previously been known to reside with a local resident while he served as a source of illegal drugs that would be distributed to other local buyers.

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

### West Virginia Law Enforcement and Mack

Meanwhile, in Randolph County, West Virginia, the Mountain Region Drug and Violent Crime Task Force ("MRDTF") was investigating a suspected drug house located on Genesis Lane in Coalton, West Virginia. Mid-day on September 23, 2021, West Virginia State Police Corporal and MRDTF Agent Joshua Tallman ("Tallman") was drafting an application for a search warrant for the Genesis Lane house after executing a series of controlled buys from the home. While Tallman was drafting the search warrant, MRDTF Commander David Vanmeter ("Vanmeter") received certain information from former task force member Gene Smithson ("Smithson"), which came from the drug task force in Ohio. Tallman learned that Mack's vehicle had a GPS tracking device on it and was presently in the Coalton, West Virginia, area, which is where officers were seeking to execute the Genesis Lane search warrant.

The same day, the wife of West Virginia State Police Sergeant D'Weise ("D'Weise"), who resides near Genesis Lane, had observed an unfamiliar Cadillac Escalade in her driveway. She told her husband about the vehicle. D'Weise observed the vehicle on a nearby road and observed the vehicle commit a traffic violation. D'Weise conducted a traffic stop and identified the driver of the vehicle as Mack. There was another African American male in the vehicle as well. D'Weise ran the vehicle's information and Mack's

Case 2:22-cr-00001-TSK-MJA Document 71 Filed 10/27/22 Page 4 of 16 PageID #: 493

USA V. MACK                                                    2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

driver's license number through the communications center during the traffic stop. D'Weise issued a warning to Mack for the traffic violation and let him proceed with his travel. Both Smithson and D'Weise contacted Tallman and provided him information regarding Mack's presence in the area that day.

Tallman finished drafting his affidavit and sought and obtained the search warrant for the Genesis Lane residence. A search of the Genesis Lane residence yielded drug use paraphernalia, digital scales, and a powder substance consistent with heroin or fentanyl. During the search warrant execution, Tallman interviewed Patricia Noel ("Noel"), a woman at the home. When questioned about the Cadillac Escalade, she reported that two black males brought "dope" to the house. Noel did not know their names, but she had seen one of the men give methamphetamine to Andre "Dre" Johnson, III. Tallman later interviewed Dre when he arrived on scene. Dre remarked that the officers needed to be careful, that "these guys" were from out of state and had connections to Detroit, and that he did not want to see anyone get hurt.

In early October 2021, Patrolman Sayre ("Sayre") of the Elkins Police Department was approached in person by a community member with information pertaining to an individual with the nickname "Amp." Sayre had known the source for a year or a few years. The

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 5 of 16   PageID #: 494

USA V. MACK                                                          2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

source told Sayre that Amp was transporting drugs from Ohio to Elkins. The source expressed that Amp was from Ohio and drove a blue Cadillac. The source told Sayre that Amp kept controlled substances in Styrofoam cups and that he would wear a construction vest when he made "drops" in an attempt to blend in. Sayre's source cited 49 Ash Lane as a "drop point" for Amp in Elkins.[1] The source knew this because the source had personally observed Amp at 49 Ash Lane.

The source did not know how long Amp had been trafficking drugs in Elkins. Sayre's conversation with the source was not a formal interview. Sayre does not recall the specific date of the conversation or where it took place because he has spoken to the source multiple times. Sayre testified that it was roughly the same month as October 2021. He testified that it could have been in the street or could have been at his office. The source indicated that the source was close with "Amp."

After Sayre had met with the source, Sayre was conducting routine patrol in Elkins and saw a black male in a Cadillac. He saw the Cadillac outside of 49 Ash Lane and saw the black male exiting the Cadillac to go to the upstairs apartment. He was wearing an orange construction vest.

---

[1] Sayre testified that a drop point is a location where controlled substances can be dropped off.

Case 2:22-cr-00001-TSK-MJA Document 71 Filed 10/27/22 Page 6 of 16 PageID #: 495

USA V. MACK 2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

### Ohio and West Virginia Law Enforcement Meeting in Elkins

Law enforcement officers from the task forces in Ohio and West Virginia met in Elkins on October 26, 2021, to share information and coordinate their investigations of Mack and the Cadillac. Myers, Tallman, and Sayre attended the meeting and shared all of the information they had acquired regarding Mack.

Certain information known to officers was corroborated by other officers. Specifically, the GPS data obtained by Ohio law enforcement had shown that Mack's vehicle was at 49 Ash Lane on numerous occasions, which was the location that had been identified by Sayre's source. Further, Sayre had personally observed a black male in a Cadillac outside of 49 Ash Lane. The black male exited the vehicle to go to the upstairs apartment, and he was wearing an orange construction vest. Both Sayre and Myers had witnessed an individual they believed to be Mack in a construction vest.

### Evening of October 26, 2021

While officers were on the way back to Ohio from the meeting, the GPS tracker showed that Mack's vehicle was driving into Elkins. Myers and others set up surveillance, waited for the vehicle to come through, and tailed it into the Elkins area. Myers contacted Tallman to let him know. Tallman followed the Cadillac to two apartment buildings in the Elkins area: Gateway Apartments and 49 Ash Lane. Tallman testified that Gateway Apartments was known for

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 7 of 16   PageID #: 496

USA V. MACK                                                          2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
   [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

drug activity.

At Gateway Apartments, Tallman saw a person coming down the stairs and getting into the Cadillac and pulling out of the parking lot. The Cadillac was there only a short time, which Tallman testified is consistent with a drug deal. Tallman then followed the vehicle to 49 Ash Lane, where the vehicle again stopped for only a short period of time. Tallman could not identify the individual because it was dark outside. Myers testified that he personally identified Mack driving the Escalade that night when he exited the vehicle to stop for gas.

**Evening of October 29, 2021
Traffic Stop and Alleged Crossing of Center Line**

On the evening of October 29, 2021, Myers notified local authorities, notably Tallman, that Mack's vehicle was traveling towards the Elkins area. Tallman asked Myers to follow the vehicle until local authorities could intercept and follow it. Tallman then called Lieutenant and K-9 Handler Dustin Cale ("Cale") of the Philippi Police Department and Sayre to inform them that Mack's vehicle was headed towards Elkins and to ask them to be prepared in case a traffic stop was conducted.

Sayre identified Mack's vehicle entering town and proceeded to follow it. He testified that he was about three car lengths behind the vehicle. Sayre testified that he witnessed the vehicle

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 8 of 16   PageID #: 497

USA V. MACK                                                          2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
[ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

commit a traffic violation by crossing left of center in the "Third Ward turn." He testified that as the vehicle drove around the curve, half of the vehicle was in the other lane. The center of the road was marked with a double yellow line. Sayre contacted Tallman to inform him of the observed traffic violation and to ask whether he should stop the vehicle. Tallman directed Sayre to stop the vehicle.

Sayre initiated a traffic stop on the vehicle. Mack was the driver of the vehicle, and Shelby Holloman ("Holloman") was riding in the front passenger seat.[2] It was night, and it was dark. The road conditions were damp. It was not raining at that time, but as the stop continued, it began to rain. Before initiating his lights, Sayre did not notice any other traffic violations. Sayre did not issue a ticket for the traffic violation or write an incident report about the traffic violation.

Mack testified that he is "100% sure" that he did not drive on or across the center line, and he did not commit any other traffic violations. He testified that he was paying attention to

---

[2] Cale arrived on the scene shortly after the traffic stop began, under ten minutes later, with canine Raptor to conduct an open-air sniff. Raptor made a positive indication for the presence of drugs in the vehicle, and authorities began to search the vehicle. Due to heavy rain, authorities were unable to fully search the vehicle; therefore, it was towed so a complete search could be made. Methamphetamine and other paraphernalia were recovered in the search, forming the basis of the underlying charges herein. Mack no longer challenges the search of the vehicle and argues only that the stop itself was unlawful.

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

the road, he understood that there was a marked center line in the road, and he saw the line. He also testified that he was not nervous about the officer's vehicle behind him.

Holloman was in the front passenger seat. She testified that she did not observe Mack drive on or over the center line or cross into another lane of travel. She testified that she did not recall that Mack was driving erratically or side-to-side. She testified that she would have felt concerned if he was swerving, but nothing about his driving concerned her that night. She testified that she could not know with 100% certainty that the vehicle never crossed the line, but from where she was sitting, her observation was that it did not.

Holloway testified that at the time when Mack's vehicle allegedly crossed the center line, her cell phone was flat on the dashboard in front of her. She was trying to buy shoes on an app called "ShoeDazzle," but she did not have good service. She testified that her phone would have "dinged" when the purchase went through, so she was listening for that sound, but she did not need to watch her phone. She testified that her attention was "partially" on the purchase and also testified that the purchase was the "main" thing on her mind. Holloman testified that she was alert and paying attention and would have noticed if Mack made any traffic violations.

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

The parties obviously disagree as to whether Mack's vehicle crossed the center line. Both Mack and Holloway testified that it did not. Sayre testified that it did. The Court finds Sayre's testimony more credible. First, Sayre's vantage point was better than Holloway's and Mack's because Sayre was immediately behind the vehicle. Second, Tallman's testimony supports Sayre's. Tallman testified that Sayre called him in the moment and told him that the vehicle had crossed the center line. Third, Holloway was at least partially distracted by the purchase she was attempting to make on her phone. Fourth, Holloway conceded that she was not 100% sure whether the vehicle crossed the center line. Fifth, Holloway is not a disinterested witness; she knew Mack well enough to be in the vehicle with him. Sixth, the Court finds that the following exchange weighs against Mack's credibility:

> AUSA: As you went around the curve, where the testimony was that you crossed the center line, and where you say you were not nervous, was there something going on on the dashboard that could have created you to be paying attention to something other than the road because it was happening on the dashboard?
>
> Mack: No, I was paying attention directly to the road.
>
> AUSA: Okay, but was there something going on on your dashboard as you went around that curve?

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 11 of 16   PageID #: 500

USA V. MACK                                                      2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
[ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

> Mack:   I was paying attention to the road.
>
> AUSA:   Was there something going on on the dashboard as you went around the curve?
>
> Mack:   I said I was paying attention to the road, sir.

Mack refused to answer whether there was something on the dashboard, which makes the Court more inclined to believe that something was "going on" on the dashboard and more likely to distract either Holloway or Mack or both. For these reasons, the Court finds that Mack's vehicle crossed the center line.

After the canine arrived and positively identified the car for narcotics, law enforcement searched the vehicle and ultimately seized 156 grams of 99% pure methamphetamine, $1,793 in U.S. currency, a "spy" device believed to detect if a person is wearing a body wire, a digital scale, and sandwich bags.

### The Indictment

On February 15, 2022, a grand jury sitting in Elkins, West Virginia, returned a two-count indictment charging Mack with Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count One) and Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count Two). See ECF No. 1.

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

## II. ARGUMENTS

Mack argues that there was no reasonable suspicion for the stop. First, he argues that he did not cross the center line. Second, he argues that if he did, the violation was not a sufficient basis for the stop. Finally, Mack argues that without a traffic violation, there is no other basis for reasonable suspicion. The Government argues that there are two bases for reasonable suspicion for the stop: (1) the traffic violation, and (2) the collective knowledge the law enforcement had about Mack.

## III. REPORT AND RECOMMENDATION

On June 21, 2022, the Magistrate Judge entered a R&R recommending that the Court deny the motion to suppress. The Magistrate Judge found that the traffic stop of the Escalade was lawful and the extension of the stop to conduct a canine sniff was reasonable. The R&R informed the parties that they had fourteen (14) days to file "specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection." The R&R further warned the parties that "[f]ailure to file written objections . . . shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals."

## IV. OBJECTIONS

On July 5, 2022, Mack filed objections to the R&R. He

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 13 of 16   PageID #: 502

USA V. MACK                                                    2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

withdrew his argument regarding the canine, focusing instead on the lawfulness of the traffic stop itself. Mack asserts that the stop was unlawful because there was no credible evidence of a traffic violation and officers had no reasonable suspicion that Mack was engaged in drug activity.

## V.    ANALYSIS

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. It is well-established that "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment and must be reasonable under the circumstances." United States v. Palmer, 820 F.3d 640, 648 (4th Cir. 2016) (citing Delaware v. Prouse, 440 U.S. 648, 653-54 (1979)). A seizure, such as a traffic stop, must be supported by "a 'reasonable suspicion,' based on articulable, particularized facts, that 'criminal activity may be afoot.'" United States v. McCoy, 513 F.3d 405, 410-11 (4th Cir. 2008) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

Reasonable suspicion "defies precise definition." Id. at 411. In determining whether reasonable suspicion exists, courts "look to the totality of the circumstances." Id. The Supreme Court of the United States has "counseled lower courts to give

Case 2:22-cr-00001-TSK-MJA Document 71 Filed 10/27/22 Page 14 of 16 PageID #: 503

**USA V. MACK** 2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

'due weight' to the factual inferences drawn by police officers as they investigate crime." Id. (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). An officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

### A. Mack's crossing of the center line provided reasonable suspicion for a traffic stop.

The Court has found that Mack did, in fact, cross the center line. Under W. Va. Code § 17C-7-1(a), "Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as [provided.]" Any person who violates this provision shall be "guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $100; upon a second conviction within one year thereafter, shall be fined not more than $200; and upon a third or subsequent conviction, shall be fined not more than $500." W. Va. Code § 17C-7-1(c).

It is well-established that a law enforcement officer is permitted to stop a vehicle when the officer observes a vehicle violating a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating that a traffic stop is reasonable at the outset "whenever it is lawful for police to

Case 2:22-cr-00001-TSK-MJA   Document 71   Filed 10/27/22   Page 15 of 16   PageID #: 504

USA V. MACK                                                    2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

detain an automobile and its occupants pending inquiry into a vehicular violation.  Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).  As such, Sayre had reasonable suspicion to stop the vehicle when it crossed the center line.

> B. **Even if Mack did not cross the center line, the stop was supported by reasonable suspicion based upon law enforcement's collective knowledge about Mack.**

Law enforcement had reasonable suspicion to believe that Mack was in the Elkins area to sell drugs and would have drugs in his vehicle.  Sayre's source, whom he has known for multiple years, had provided information to him within the past month that a man nicknamed "Amp" was using an apartment located at 49 Ash Lane as a "drop point" for illegal drugs when he came to the Elkins area. The informant further stated that Amp would wear a construction vest to blend in whenever "making drops."  Thereafter, Sayre personally observed a black male wearing a construction vest and his Cadillac Escalade at 49 Ash Lane.

"Amp" was linked to Mack during the meeting on October 26, 2021, when Myers told Sayre that Mack wore a construction vest when driving between locations and that GPS data had placed Mack's vehicle at Ash Lane.  Ohio law enforcement had information from a CI that Mack, a black male, was a source of drugs for a local dealer.  Law enforcement in both Ohio and West Virginia had

Case 2:22-cr-00001-TSK-MJA Document 71 Filed 10/27/22 Page 16 of 16 PageID #: 505

USA V. MACK                                                    2:22-CR-1

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [ECF NO. 39] AND DENYING MOTION TO SUPPRESS [ECF NO. 21]**

confirmed that a certain Escalade was registered in Mack's name. The night of the meeting, Tallman followed Mack's Escalade to 49 Ash Lane. All of this information, along with the GPS data's indication that Mack was making frequent trips to Elkins, supports a reasonable suspicion that Mack was visiting Elkins to distribute drugs and would have drugs in his vehicle at the time of the stop.

## VI.  CONCLUSION

For the reasons discussed herein, the R&R is **ADOPTED** [ECF No. 49], to the extent consistent with this order, and the motion to suppress is **DENIED** [ECF No. 21].

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record and all appropriate agencies.

DATED: October 27, 2022

*Tom S Kleeh*
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA